## NEW ERA MANUFACTURING COMPANY, Appellant, v. O'REILLY et al.

### Division Two, June 19, 1906.

1. **LANDLORD AND TENANT: Liability: Implied Obligation: Steam: Double Building.** In the absence of contractual obligations, the landlord is liable to his tenant only for acts of misfeasance, not of nonfeasance. And guided by this rule it is held that it will not be implied that the lease contemplated that the landlord would furnish the lessee all the steam that might be necessary for the heating of one half of a large building or for running the dynamo and engine, from the fact that the heating and power plant was located in the other half of the building not accessible to this lessee. On the con-

trary, the lessor having expressly agreed that in case the other half became vacant during the life of the lease he would pay any excess in the cost of operating the heating and power plant which might be caused thereby, he cannot be held except for a violation of that agreement.

2. ———: **Capacity of Dynamo: Complaint: Reasonable Time.** Unless the lessee complains within a reasonable time that the dynamo and engine which the landlord agreed to put in the building were not of the capacity called for by the contract, he will be held to have accepted those furnished as meeting the tests required. And his use of them for a year without complaint under a five-year lease was an acceptance, and a waiver.

Appeal from St. Louis City Circuit Court.—*Hon. Robert M. Foster,* Judge.

AFFIRMED.

*Lee Sale* for appellant.

(1) The court erred in holding that there was no obligation on the part of the landlord under the lease with reference to the furnishing of steam to plaintiff. Pollock on Contract (7 Ed.), 245; 2 Page on Contracts, sec. 1118; Pordage v. Cole, 1 Saund. 319*h;* French v. Bent, 43 N. H. 448; Booth v. Rolling Mill Co., 74 N. Y. 15. (2) The court erred in excluding the testimony offered by plaintiff tending to show that the dynamo and engine installed in plaintiff's premises were not a 30 kilowatt 220-volt dynamo and engine.

*Kinealy & Kinealy* and *James P. Maginn* for respondents.

(1) There is no liability under the terms of this lease upon the lessor because of disagreements that arose between the lessee and Singer Bros. over the matter of appellant's obtaining steam from the boiler plant in the building occupied by Singer Brothers or because

of the failure of the latter to furnish such steam. Roberts v. Cottey, 100 Mo. App. 500; Morse v. Maddox, 17 Mo. 569. (2) The evidence offered by appellant and excluded by the court as to the capacity of the dynamo and engine was incompetent because appellant did not within a reasonable time after their installation complain to the lessor that the dynamo and engine were not of the character and capacity called for by the lease, and also because it was not shown that at the time that the alleged tests were made the dynamo and engine were in the same condition as they were when installed. Lamar Water & Electric Light Co. v. Lamar, 140 Mo. 145.

GANTT, J.—This was an action commenced in the circuit court of the city of St. Louis for alleged breaches by the lessor in a certain lease made by the lessor, Dr. Thomas O'Reilly, to the plaintiff company on the 25th of October, 1899.

The petition alleged that on said date the said O'Reilly leased to plaintiff the premises known as 905 and 907 Lucas avenue in the city of St. Louis, for a period of five years, commencing January 1, 1900; that the said premises were a part of a certain eight-story brick building and basement known as 901, 903, 905 and 907 Lucas avenue; that the said building and basement were divided off by partition walls so as to render them fit and suitable for occupancy by two distinct tenants, 901 and 903 by one tenant, and 905 and 907 by another, both of said tenements being adapted for use as manufacturing establishments; that the premises 901 and 903, at the time of the execution of the lease to plaintiff, contained a boiler plant adapted for the production of steam, which was to be used for furnishing heat, light and power for both tenants, and that there were pipes and other apparatus running from the premises 901 and 903 through and about the floors of premises 905 and 907, which were connected with the

boiler plant, and receiving steam therefrom; that there is also in the premises 905 and 907 two elevators with the necessary machinery and apparatus for operating the same and also machinery and apparatus for heating the premises by means of steam generated by the said boiler plant. The petition then alleges that at the date of the lease Singer Bros. were in possession of 901 and 903 under a lease from said O'Reilly; that in the lease to plaintiff said O'Reilly agreed to put the boilers, engines, elevators and radiators and the machinery for operating the two elevators and for heating the building in good condition, and to wire the building for electric lighting, and to furnish in the premises 901 and 903 a 30 kilowatt 220-volt constant potential direct coupled dynamo and engine, and to deliver the premises to plaintiff on December 15, 1899.

It is further alleged that by said lease said O'Reilly obligated plaintiff to pay to the lessee of the premises 901 and 903 monthly on demand one-half of the total cost of running and operating the boiler plant, including in such costs all outlays for salary, wages, coal, repairs and other expenses and that it was provided that such payment by plaintiff should be for the steam heat and power and the running of the said dynamo and engine, and also for live steam for plaintiff's dryer and laundry machine, and in consideration of said monthly payment by plaintiff to lessee of 901 and 903 would furnish steam for all purposes aforesaid. It is then alleged that on December 15, 1899, plaintiff took possession of the premises 905 and 907 with all repairs and alterations made except the installation of the dynamo and engine, which was provided for in the lease, plaintiff relying upon the agreement of O'Reilly to furnish the dynamo and engine later; that on February 22, 1900, O'Reilly installed the dynamo and engine, which plaintiff alleges was not capable of doing the work of a 30 kilowatt 220-volt dynamo and engine, but was of inferior capacity and insufficient for

the uses for which said dynamo and engine are designed. The petition then proceeds to state the various items of damage to plaintiff by the insufficiency of the dynamo and engine furnished by O'Reilly; that since the taking of possession by plaintiff of the premises on December 15, 1899, plaintiff had paid to Singer Bros., the tenants of the premises 901 and 903, half of the total cost of running and operating the said boiler plant and was continuing so to do as required by said lease; that on February 11th, 1902, Singer Bros. did decline and refuse to furnish steam to plaintiff for the running of said dynamo and engine unless plaintiff would agree to pay the entire cost of furnishing said steam and of running and caring for the said dynamo and engine, and that plaintiff thereupon notified the defendants of such refusal on the part of Singer Bros., but defendants have failed and refused to require Singer Bros. to furnish such steam; that the said O'Reilly died February 24, 1901. Plaintiff then states that while the dynamo and engine were being operated in plaintiff's premises between February 22, 1900, and June 23, 1901, at which time it broke down, plaintiff was required to pay and did pay the entire cost of the services of a competent electrician whose services were required for the care of the dynamo and engine, and that Singer Bros. refused to furnish an electrician for that purpose, by reason of which failure plaintiff was compelled to expend $731.45.

The petition further alleges that since June 3, 1901, plaintiff has been compelled to obtain all of the electric light and power required by it for use in its business from persons other than the Singer Bros., and to furnish steam for the dynamo and engine plaintiff will be compelled to purchase electric light and power during the unexpired term of the lease, all to the plaintiff's damage in the sum of $5,650.30.

Inasmuch as the court sustained a demurrer to the evidence, it is deemed unnecessary to refer to the ans-

wer of the defendant and plaintiff's reply thereto. The lease offered in evidence let to the plaintiff ''the eight-story brick building and basement known as Nos. 905 and 907 Lucas avenue for a period of five years commencing January 1st, 1900, at a rental of $4,000 per year for the jobbing and manufacturing of shirts, cloaks, suits, etc.'' For the purpose of this case the material provisions of the lease are as follows:

''Said lessor hereby covenants and agrees to put the boilers, engines, elevators and radiators, and all the machinery and apparatus in said building for the operation of the two elevators therein, and for the heating of said building, and all plumbing and sewer connection in good condition.

''The lessor further covenants and agrees to make the following alterations, additions and repairs in and to said premises, to-wit:

''1st. To furnish a 30 kilowatt 220-volt constant potential direct coupled dynamo and engine, for the exclusive use of said lessee.

''2nd. To wire the building for twenty multiple arc and 200 16-candle power incandescent lights, and to furnish 20 arc lamps of a pattern similar to those used by the Imperial Electric Light, Heat & Power Company, of this city, namely, a direct current enclosed multiple arc lamp; out-lets and arc lamps to be located as designated by lessee.

''It is further agreed that should Singer Bros. vacate their present building, 901 and 903 Lucas avenue, during the period of this lease, said party of the second part shall get the preference of the leasing of the entire building. It is further agreed that said lessee shall get full possession of the leased premises, December 15, 1899, with all repairs and alterations completed, and that rents shall commence and be payable under this lease on January 1, 1900. It is further agreed that should premises 901 and 903 Lucas avenue be vacated prior to the expiration of this lease, the lessor shall pay

any excess in the cost of operating the heating and power plant which may be caused thereby to this lease.

"Said lessee agrees to pay to the lessee of Nos. 901 and 903 Lucas avenue monthly on demand of such lessee one-half of the total costs of the running and operating the boiler plant on said premises, including in such costs all outlays whatever for salary, wages, coal, repairs and other expenses in payment to the said lessee for the steam, heat and power, furnished to it, also including power and the running of the said 30 kilowatt dynamo and engine, live steam for dryer and laundry machinery, and if the said sum of one-half shall not be paid by said lessee herein to the lessee of Nos. 901 and 903 Lucas avenue within five days after demand thereof, then said last-mentioned lessee shall not be bound to furnish steam to the lessee herein while such default or nonpayment continues."

T. L. Rubenstein, president of the plaintiff company, testified that the plaintiff went into possession of the premises December 15, 1899; that the building is eight stories high and divided by walls all the way down to the basement; that in the basement there is a large opening with double fire-doors connecting premises 905 and 907 with premises 901 and 903, which latter premises were, in 1899 and up to the date of the trial, occupied by the firm of Singer Brothers; that this double fire-door was the means of ingress and egress to the engineer in charge of both buildings; that one Clarence Collins was the engineer; that he was the engineer for Singer Brothers who was in charge of the boiler plant and who also looked after the elevator and heating apparatus of the plaintiff as well as of Singer Brothers, attending to matters of this kind for the tenants of both premises. This witness further stated that the double doors in the basement were closed and locked by the engineer when through with his work and that, while entrance from premises 901 and 903 to

plaintiff's premises could be had, plaintiff had no means of ingress into premises 901 and 903 after the doors were locked, they being locked on the Singer Brothers side. This witness further testified that the entire boiler plant which furnished the steam that was used for heating as well as for power was located in premises 901 and 903, that in premises 905 and 907 the entire heating apparatus consisting of pipes and radiators which were intended to heat the premises were located, as were also two steam pipes used in hoisting elevators and that these were connected with pipes in premises 901 and 903 running to the boiler plant, and that the steam could be turned off or on only through Mr. Collins, the engineer, who was in the premises 901 and 903, for the reason that the boiler plant was located in the last-named premises. Witness further stated that when plaintiff went into the premises under the lease the premises were ready for occupancy as provided in the lease with the exception that the dynamo and engine which was for the purpose of generating electricity for lighting and for motor power in plaintiff's premises, had not yet been installed; that this dynamo and engine were also operated by steam power furnished from the boiler plant in premises 901 and 903. Witness further stated that a dynamo and engine were installed in the premises in February, 1900, and that from December, 15, 1899, to the date of the installment of the dynamo and engine plaintiff obtained its light and power by means of an auxiliary connection from a company furnishing light and power.

Plaintiff offered to show by this witness that the landlord made plaintiff an allowance on account of electric light and power for the time when plaintiff was compelled to purchase such light and power from outside parties for the reason that the dynamo and engine had not been installed, but the court excluded this testimony.

The evidence further shows that about February

18, 1900, a dynamo and engine were installed in the premises 905 and 907 and that plaintiff used the same until June, 1901, at which time the engine broke down completely.

Plaintiff offered evidence tending to show that it paid to Singer Brothers each month one-half of the total cost of running and operating the boiler plant, as provided in the lease; also evidence tending to show that Singer Brothers refused to furnish plaintiff steam for running the dynamo and engine unless it would pay the entire expenses of running and caring for the dynamo and engine.

Plaintiff further offered to show the increased cost to plaintiff in consequence of Singer Brothers' refusal to furnish steam for the running of the dynamo and engine, but the court excluded all of these offers, on the ground that the lessor was not obligated under the lease to furnish power or steam to the plaintiff.

On the question as to whether the dynamo and engine installed by the lessor were a 30 kilowatt 220-volt dynamo and engine, the court excluded the testimony of H. H. Humphrey, a consulting electrical engineer, who examined the dynamo and engine on February 10th and 11th, 1902, as to whether or not the dynamo and engine were a 30 kilowatt 220-volt dynamo and engine, the witness testifying that on that date the dynamo and engine were both in good operative condition. The court also excluded the testimony of this witness as to the amount of electric energy the dynamo and engine were capable of producing on February 10th and 11th, 1902. The court also excluded the testimony of this witness as to the test which he made of the machine on February 10th and 11th, 1902.

Clarence Collins on behalf of plaintiff testified that the dynamo and engine had no ampere meter on it at the time it was installed and that the dynamo and engine were in good condition at the start. This witness

furnished steam for the dynamo and engine from February, 1900, to June, 1901.

Charles R. Martin, an electrician, testified that he was in the employ of plaintiff from the 10th of March to the 11th of August, 1900, that there was no meter on the dynamo and engine, that an ammeter is as essential to a dynamo as steam is to an engine, and that no correct ammeter was put on the dynamo during his employment by Singer Brothers and plaintiff, and that frequent complaint was made of this fact.   He also stated that the dynamo and engine were in the same condition practically when he left the employment of the plaintiff and Singer Brothers, as when the dynamo and engine were first installed. That there was nothing about the condition of the dynamo at that time that would render it less effective or less able to produce electrical power, that he had always had more or less trouble with the engine from the start, but that there was no difference in respect to the engine at the time he quit from what it was at the time it was installed.

E. J. Hall, an electrician, testified that he was in the employ of plaintiff from September, 1900, until May, 1901, and that he took care of the dynamo and motor and lights.   That when he first went into the employ of the plaintiff there was no ampere meter on the dynamo, but that one was put on it a short while after he went there.   That he took readings of the meter and that he was able to state what those readings disclosed as to the electrical power or energy that the dynamo and engine were producing. Upon being asked to state what the readings disclosed, the court excluded the testimony, although the witness stated that there was nothing about the dynamo and engine that could operate to prevent its producing the normal electrical energy that the engine was capable of producing.   The court excluded all the testimony of this witness as to how much electrical energy the dynamo and engine were capable of producing.

There was no evidence that the plaintiff ever at any time complained to Dr. O'Reilly or his executors that the engine and dynamo which were installed in the premises 905 and 907 were not of the size or character called for by the lease. This engine and dynamo were put into the building about February 20, 1900, and plaintiff's electrician took charge of and managed them until May, 1901. There was no evidence as to how the dynamo and engine had been used or misused during the time that the electrician, Lamb, had charge of it, and Mr. Rubenstein testified that it broke down entirely in June, 1901, and they stopped using it. At the conclusion of the plaintiff's testimony, the court sustained a demurrer to the evidence and thereupon the plaintiff took a nonsuit and after an unsuccessful effort to have the same set aside this appeal was duly taken.

I. The controlling question upon this appeal is, did the lessor by his lease to plaintiff obligate himself to furnish to plaintiff, his lessee, steam for the building he leased plaintiff? "In the absence of contractual obligations the landlord as to his tenant is only liable for acts of misfeasance and not of nonfeasance." [Vai v. Weld, 17 Mo. 232; Morse v. Maddox, 17 Mo. 569; Burnes v. Fuchs, 28 Mo. App. 279; Ward v. Fagin, 101 Mo. 669; Roberts v. Cottey, 100 Mo. App. 500.]

The plaintiff bases its contention that Dr. O'Reilly, his landlord, is liable to it for the damages resulting to it from a refusal of Singer Brothers, the tenants of the adjoining building, to furnish it steam to run its dynamo and engine because when it leased the premises Nos. 905 and 907 Lucas avenue, the said building was so constructed and so fitted up by pipes connecting it with the heating plant in the basement of the adjoining building Nos. 901 and 903, also belonging to its lessor, that it was clearly contemplated that all steam that might be necessary for the heating of plaintiff's premises or the running of its dynamo and engine

should be furnished by the tenant or occupant of the adjoining building Nos. 901 and 903.

It is important to keep in view that the premises 901 and 903 were under lease and occupied by Singer Bros. when the lease to plaintiff was executed. It is conceded there is no express agreement by Dr. O'Reilly in the lease to furnish steam to plaintiff, but plaintiff seeks to raise an implied agreement from the circumstances. In the light of the whole lease we can find no ground for such an implication. On the contrary, Dr. O'Reilly limited his liability to plaintiff as to the supply of heat by express stipulation, to-wit, that in case his building Nos. 901 and 903 should become vacant during plaintiff's lease, he would pay *any excess* in the cost of operating the heating and power plant which might be caused by the adjoining premises becoming vacant.

The agreement by plaintiff was to purchase steam from Singer Bros. at a fixed price but there was no corresponding obligation on plaintiff's part to take steam from Singer Bros.

The provision that plaintiff should pay Singer Bros. one-half the cost of operating the boiler plant was evidently for the purpose of fixing a basis to determine Dr. O'Reilly's liability if Nos. 901 and 903 should become vacant in which event *only* was he to pay plaintiff any *excess* in the cost of operating its heating or power plant. This provision in the lease does not in the case of vacancy authorize plaintiff to take possession of the boiler plant in 901 and 903 and operate it, neither did it require the plaintiff's lessor to do so. It merely provides that in such a contingency, the landlord would pay the *excess* of cost in operating plaintiff's heating and power plant by reason of being compelled to obtain steam from outside parties, over what it had cost to get it from Singer Bros.

Singer Bros. were in no sense the agents of Dr. O'Reilly, but were his tenants with fixed rights. They

could furnish or refuse to furnish plaintiff steam without involving Dr. O'Reilly in any way and under its lease plaintiff could take or refuse to take steam from Singer Bros., without violating its lease.

We think the circuit court unquestionably was right in its construction of the lease and in holding that there was no implied covenant on the part of Dr. O'Reilly to furnish plaintiff steam or compel his other tenant, over whom he had no control in this respect, to furnish plaintiff steam at a fixed price.

II. As to the contention that the circuit court erred in excluding evidence as to Dr. O'Reilly making an allowance on the rent for the time covered by the lease before the dynamo and engine were installed, it is obvious no error was committed. The engine and dynamo were to be installed by January 1, 1900, but owing to the delay of the contractors therefor it was not placed in the building until February 20, 1900. The fact that Dr. O'Reilly made an allowance on the rent for this failure on his own part to comply with his agreement, could not possible shed any light on the question of his liability for the failure or refusal of Singer Bros. to furnish plaintiff steam. The proposed offer was utterly irrelevant to the issue.

III. The final contention is that the court erroneously excluded evidence offered by plaintiff to show that the dynamo and engine furnished by the lessor was not a 30 kilowatt 220-volt dynamo and engine.

As to this, the testimony disclosed that the dynamo and engine were to be installed before January 1, 1900, but was not in fact put in until February, 1900. There was no evidence whatever that plaintiff ever made any complaint to its lessor that the dynamo and engine were not of the character and capacity called for in the lease.

We think it was the duty of the plaintiff within a reasonable time to notify Dr. O'Reilly of any failure in the dynamo and engine to meet the tests required by

the lease. Plaintiff had used the engine and dynamo for a year before Dr. O'Reilly died and made no complaint of it. We think that the well-settled principles of law should be applied in this case. In the law of sales, where an article is furnished pursuant to a contract requiring it to be of a certain quality, the buyer must at least object to its quality within a reasonable time after its receipt, else the law will treat the receipt as a final acceptance and preclude any later objection on the ground of inferior quality. [Benjamin on Sales, section 703; Graff v. Foster, 67 Mo. 520; Water Co. v. Aurora, 129 Mo. 541.]

So where a water company furnishes water to a city under a written contract as to standard, the use of the water for a year without objection as to quality, was held a waiver. [Lamar Water Company v. Lamar, 140 Mo. 145.] But the evidence offered as to the test was incompetent for another reason. The test made by Mr. Humphrey was two years after the machine had been installed and six months after it had broken down. The question was as to the capacity of the machine in February, 1900, when furnished. There was no evidence or offer of evidence as to how the machine had been used or misused, and accordingly the offers were too remote and did not tend to show the dynamo and engine were not of the character and capacity called for in the lease when they were installed.

We think the demurrer to the evidence was properly sustained and the judgment of the circuit court is affirmed.

*Burgess, P. J.,* and *Fox, J.,* concur.