GUSSIE D. HAVENS, Respondent, v. CLAUDE P. BROWN, Appellant.

Kansas City Court of Appeals. January 30, 1922.

1. **LANDLORD AND TENANT: Lease: Implied Covenant: Lease of Premises in Present Condition Held to Include Implied Covenant to Furnish Heat Where There was no Other Method of Heating Premises Except Through Another Building Owned by Lessor from which Heat had Been Supplied.** Where plaintiff leased for a term of three years, "in the present condition thereof," an apartment hotel building which was connected structurally with another building, owned by lessor and from which heat had been supplied, and where plaintiff's lease did not provide for heat but the evidence showed that there was no other method of heating the premises, there was an implied covenant on the part of the lessor to supply the heat necessary to keep premises warm and habitable.

2. ————: **Where Lease Required Lessee to Repair Frozen Pipes Such A Provision Did Not Relieve Lessor of Obligation to Supply Heat for Premises.** Lessor was required to furnish heat even though plaintiff's lease provided that plaintiff should not be liable for "necessary repairs to worn out pipes in plumbing, and any pipes, that are frozen are to be thawed out and repaired at lessee's expense."

3. **APPEAL AND ERROR:** Judgment for Right Party Will Not be Disturbed Because of Error in Admission of Testimony. Where the admission of testimony is complained of as being erroneous but the judgment is for the right party, the judgment will not be reversed on acconut of the admission of such testimony.

Appeal from the Circuit Court of Jackson County.— *Hon. O. A. Lucas,* Judge.

Affirmed.

*Wilhelm Heidelberger* and *Robt. O. McLin* for respondent.

*James A. Shannon* and *Seehorn, Barnes & Schwartz* for appellant.

BLAND, J.—This is a suit by a tenant against her landlord to enjoin him from cutting off heat from the leased premises. A permanent injunction was issued and defendant has appealed.

The facts show that the premises were leased from one B. C. Christopher by plaintiff for three years beginning June 1, 1919, "in the present condition thereof," at $206 per month. No mention of heat is made in the lease. These premises are located at the southwest corner of Eleventh and Cherry streets in Kansas City, Missouri.

The appearance of this structure would indicate that it was of the old fashioned "block" construction, containing several apartments running from the basement to the roof and built with common walls. It extended from the corner west fifty-six feet on Eleventh street. There was an areaway about six feet in width a short distance south of Eleventh street which ran from Cherry street west to the rear. The building south of the areaway was thirty-eight feet from east to west. This areaway was enclosed in front by the Cherry street wall of the building except for an arch at the bottom, which left an opening to the areaway fifteen feet, six inches high and six feet in width. The building was composed

of a basement and three stories. That portion of the building south of the areaway was lower than that north, apparently on account of the decline·of Cherry street towards the south. The two portions of the building were physically connected by means of the wall with the arch that we have already mentioned and a covered stairway running through the areaway from the north to the south portion of the building, a short distance back of the Cherry street front, with two rooms on two floor levels immediately above the stairway. The stairway and rooms being one continuous structure and covered with sheet iron. The stairway had been cut off from the north portion of the building and the rooms above opened into the portion of the building south of the areaway, but had no connection with that north, so that while the two parts of the building were connected structurally there was no way by which a person could pass from the north section of the building to the south without going outside.

Plaintiff leased all of that part of the building north of the areaway which had its length and main entrance on Eleventh street. This portion of the building was originally divided into three apartments but had been cut up so as to make a hotel and rooming house consisting of thirty-seven rooms. Each one of these rooms had a steam radiator which connected with pipes that led to the steam generating plant located in the basement in the south portion of the building just immediately south of the areaway, the boilers being connected with· plaintiff's portion of the building by a pipe running under the areaway. There was no way of shutting off the heat and it had been furnished by the landlord without additional cost for several years.

On August 1, 1920, Christopher leased for ninety-nine years the entire building to the California Realty Company and the latter on August 2, 1920, assigned said lease to the defendant. The ninety-nine year lease and assignment thereof were subject to plaintiffs lease. Plaintiff's lease does not provide for heat and the ques-

tion for determination is whether or not there was an implied covenant on the part of the lessor to supply the heat necessary to keep these premises warm and therefore habitable, they being leased for living purposes. There can be no question but that under the facts there was such an implied convenant providing there was no other method of heating the leased premises. [Berlinger v. MacDonald, 133 N. Y. Suppl. 522; Graham v. Grape Capsule Co., 113 N. Y. Suppl. 103.] If there was no other method of heating the premises, plaintiff can maintain this suit to prevent the landlord from cutting off the heat being furnished by the heating plant in use. [New Era Mfg. Co. v. O'Reilly, 197 Mo. 466, 476.]

Plaintiff testified that after defendant bought the ninety-nine year lease he called upon her and "talked about things in general and wanted to know when did we need heat and when it was customary to start up the heat;" that defendant made no objection to furnishing the heat and thereafter it was turned on and remained on a week when defendant notified her that if she desired heat to be supplied she would be required to pay $80 per month therefor, beginning November 1st, in addition to her regular rent. On November 17, 1920, defendant started to put in a cut-off valve in the pipe leading from the boiler to plaintiff's radiators when this suit was brought to enjoin him from cutting off the heat afforded by the existing heating plant.

It appears that there were a number of chimneys in the building and that there had been several grates or fireplaces and flue holes. When plaintiff was put upon the stand she attempted to testify as to whether some of these had not been stopped up but apparently she had made little investigation concerning the matter and only gave "her understanding" of what the conditions were. She had made no effort to furnish her own heat, and as she had always obtained heat from the steam heating plant it would appear that there had been no occasion for her to investigate as to whether there was any other means of obtaining heat. However, she did testify that if there

were flue holes they had been papered over, that there was no evidence of any flue holes and that there was no plumbing for gas heating. The evidence does not show how long the steam heating plant had been in operation but the premises had been heated by it for at least fourteen years prior to the time plaintiff took possession. During the trial of the case she examined the premises and found that there were only four fireplaces or grates above the basement in the entire premises, one of these fireplaces had "a plaster board" in front and it appeared to be solid back of this. This board could not be removed without "damaging the room considerably" and "it appeared to go back against something solid." A second fireplace "was very small, seemed to be brick in the back and had no grate in it." "It apparently was bricked in and solid," the brick and mortar were in plain view. The flue to the third had been closed with cement. The fourth fireplace seemed to be slightly larger than the other three but there was no grate in it and it was so near the floor line that if a fire was built in it, it would likely damage the floor.

An apparently disinterested witness by the name of Morgan, a former tenant for fourteen years prior to plaintiff's tenancy, testified that the only method of heating the premises was from the boiler as we have already described; that during the time he was there the premises had been remodeled and that some of the fireplaces were taken out and part of them cemented over and that most of the flues were cemented over on top to keep dirt from falling down. He did not know whether all of the chimneys were that way or not. He testified that there were eight or nine fireplaces there at the time of the trial but only four above the basement and they were on the second floor but none on the third floor; that these four fireplaces were small, one of them was bricked up solidly with brick and cement; that they were all choked up by "a solid masonry of some sort;" that to his knowledge there was no way of building fires in them. He testified that the cement on top of the flues could be removed.

Defendant during the trial of the case took the city building inspector to the premises to inspect them and to ascertain what other method of heating, if any, was present. The inspector testified that plaintiff refused to allow him to enter. However, plaintiff contradicted this but stated that her tenants had been "complaining to me most dreadfully about being annoyed by people coming around and insisting on coming and poking up the walls and punching the paper, and so on," and that "I could not hardly endure it longer," so she turned the matter over to the housekeeper with the direction "Well, do just the best you can." She did not hear what the housekeeper said to them. However, the building inspector was enabled to inspect one of the apartments downstairs and one upstairs. He testified that he was not permitted to inspect the rest. He testified that he found flues and chimneys in places where stoves could be erected and fires lighted; that he saw plumbing for gas heating in an apartment downstairs. On cross examination he testified that he saw one fire place on the first floor and it had no grate in it; this fireplace had an opening in the flue. Another witness for the defendant testified that he saw the building when it was originally erected and it had fireplaces and flues in it then and that he had seen openings in the flues over the mantels and that there were holes for stovepipes; that each one of the apartments had flues and that they showed from the roof at the time of the trial.

Plaintiff's evidence tends to show that there was no safe place to build a fire in the leased premises and no method of heating it except by means of the steam heating plant by which it had been heated for many years. We are very doubtful if defendant's evidence shows that the premises could have been adequately heated by other methods. While there is evidence on defendant's part that there was one fireplace that had an opening and flue and while one of defendant's witnesses testified that there were a number of fireplaces with openings in the flues for stoves, it is not clear that this witness made

an examination to know what flues had been closed. So defendant's evidence shows that there was one fireplace on the first floor without a grate that could have been used and that there was plumbing for gas heating on the same floor. Does not defendant's evidence fall short of showing that the premises could have been *adequately* heated by other means than the regular heating plant? It may have been at one time that these premises were partly, and possibly wholly, heated by means of grates and stoves but if this condition existed at one time, it was changed after the steam heating plant was installed because there is evidence of a disinterested witness, a tenant who preceded plaintiff, that after the installation of the steam heating plant the premises were remodeled and a great number of the flues cemented over, and that most of the fireplaces had been bricked up. In view of the whole testimony we are not disposed to disagree with the chancellor who tried the case in his conclusion that the premises were not equipped with apparatus sufficient to heat them other than the steam heating plant that existed there. This case is not like that of New Era Mfg. Co. v. O'Reilly, supra, cited by defendant. In that case the lease contained a provision that negatived any idea of the landlord furnishing heat.

Defendant insists that by reason of the fact that plaintiff's lease provided that plaintiff should not be liable for ''necessary repairs to worn out pipes in plumbing and any pipes that are frozen are to be thawed out and repaired at lessee's expense,'' it was apparent that it was not contemplated that the lessor would heat the building, because if that were so, ''he also obligated himself to keep the temperature above freezing point'' but that if the leased premises were to be heated by the tenant ''it would be reasonable . . . that the tenant should be held responsible for any damage done through failure to maintain the premises at a proper temperature.'' There are other ways by which the plumbing might have been frozen than by low temperature caused by lack of competent heating apparatus, such pipes could

be frozen by the heat being turned off at the radiators or by windows being left open in extreme cold weather.

The trial court admitted testimony tending to show that plaintiff and Christopher's agent who negotiated the lease with her had agreed that the premises would be heated by the landlord by means of the steam heating plant during her tenancy and that it was her understanding that it would be so heated. The admission of this character of testimony is complained of but as we have concluded the judgment was for the right party regardless of the issue attempted to be raised by the admission of such testimony, we will not reverse the judgment by reason of its admission.

The judgment is affirmed.    All concur.